# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF GEORGIA
# ATHENS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | 3:14-CR-46 (CAR) |
| | : | |
| ERICKSON MEKO CAMPBELL, | : | |
| | : | |
| Defendant. | : | |

_____

### *ORDER DENYING MOTION TO SUPPRESS*

Defendant Erickson Meko Campbell is charged with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § § 922(g)(1) and 924(a)(2). The charge results from the traffic stop, search of Mr. Campbell's vehicle, and seizure of a firearm. Mr. Campbell filed a Motion seeking to suppress the evidence, arguing there was no probable cause for the traffic stop, and the officer measurably extended the traffic stop in violation of the Fourth Amendment. This Court held a hearing on the Motion and allowed the parties to file post-hearing supplemental briefs. The Court subsequently requested the parties file a second supplemental brief on the potential applicability of

1

*Davis v. United States* to this case.[1] Thereafter, Defendant filed a Motion to Strike [Doc. 40] portions of the Government's second supplemental brief as nonresponsive. Both Motions are now ripe for decision. The Court finds it unnecessary to strike any portion of the Government's supplemental brief. Additionally, the Court finds the traffic stop here was lawful, and Defendant's detention was not unconstitutionally prolonged. Thus, the search and resulting seizure of the firearm will be upheld. Defendant's Motion to Suppress [Doc. 26] and Motion to Strike [Doc. 40] are **DENIED**.

## MOTION TO STRIKE

Defendant seeks to strike the portions of the Government's second supplemental brief that are not responsive to the Court's request for briefing on the potential application of *Davis*. Alternatively, Defendant asks to file a brief addressing the Government's arguments. The Court, however, finds both actions unnecessary. The Government did not raise any novel issues or arguments in its brief that this Court has not considered and evaluated in ruling on the Motion to Suppress. This Court has thoughtfully and carefully determined every issue in this case after thoroughly researching, studying, and contemplating the facts with the current state of the law. The

---

[1] 131 S.Ct. 2419 (2011). Because the stop, search, and seizure in this case were lawful, the Court need not discuss *Davis*.

2

Court has evaluated all angles of this case, both argued and not argued, and finds any need to strike or allow additional briefing unnecessary. Thus, Defendant's Motion to Strike is DENIED.

## MOTION TO SUPPRESS

### FINDING OF FACTS

On December 12, 2013, at approximately 9:00pm, Greene County Deputy Sheriff Robert McCannon was patrolling on Interstate 20 when he observed a grey Nissan Maxima cross the fog line; thus, he initiated the video camera in his police vehicle. Deputy McCannon observed the vehicle cross the fog line a second time, and when the driver turned on his left blinker to signal a lane change, the blinker flashed at a rapid pace, suggesting a malfunction with the signal lights. McCannon ran the vehicle's tag and learned that the vehicle belonged to Defendant. McCannon initiated a traffic stop for failure to maintain lane, in violation of O.C.G.A. § 40-6-48, and failure to maintain a signal light in good working condition, in violation of O.C.G.A. § 40-8-26.

Upon initiation of the stop, Defendant immediately pulled over and came to stop. Deputy McCannon approached the vehicle from the passenger side and requested Defendant's driver's license. McCannon testified that he noticed Defendant was

3

breathing heavily, was nervous, and was shaking when he handed McCannon his license. McCannon explained to Defendant that he was stopped for failing to maintain his lane and for the malfunctioning signal light. McCannon had Defendant activate his left turn signal, which showed that the signal light was rapidly flashing. McCannon informed Defendant that he most likely had a bulb out, and they engaged in a short conversation about the cause of the rapidly-flashing blinker. McCannon examined the vehicle's brake lights and the front signal lights to ensure they were working properly. McCannon then told Defendant it was likely that his signal light "was going bad" and that he would not write Defendant a ticket.[2] The stop had lasted 1 minute and 55 seconds.

Deputy McCannon then asked Defendant how far he had to travel, to which Defendant replied he was going to Augusta, Georgia. McCannon asked Defendant how long he was going to be in Augusta, whether he worked there, and if he had family there. Defendant responded to each question and told McCannon he was going to see his family. Thereafter, McCannon asked Defendant to step out of the vehicle and come back to the police car, where he would write him a warning "and send him down the

---

[2] Exhibit G-1, Police Video, 4:41 [Doc. 37].

road."[3] McCannon and Defendant walked to the front of the police car, and McCannon retrieved the citation forms out of his vehicle. Three minutes and 17 seconds into the stop, McCannon began to complete the warning citations.[4]

While Deputy McCannon began writing the warning, he and Defendant engaged in a conversation in which McCannon asked Defendant about the weather, what kind of work Defendant does, and where his family lives in Augusta.  Defendant responded to each question. Two minutes after he began writing the warning, McCannon stopped to get a jacket out of his vehicle because he was cold.[5] It took McCannon approximately 30 seconds to retrieve and put on his jacket. After putting on his jacket, McCannon continued to write the warning.  McCannon informed Defendant that his driver's license would expire at the end of the month. He also asked Defendant if he was driving with a firearm, to which Defendant responded no. In continuing to complete the citation, McCannon asked Defendant the year his car was made, and they engaged in a short conversation in which Defendant told McCannon he had acquired the car from an older couple.

---

[3] *Id*. at 5:12.
[4] *Id*. at 5:48.
[5] *Id*. at 7:48.

5

Approximately 3 minutes and 28 seconds after McCannon first began writing the citation, Sergeant Patrick Paquette arrived on the scene.[6] McCannon acknowledged Sergeant Paquette and then asked Defendant when he last received a traffic ticket, to which Defendant responded about four years ago. McCannon called dispatch to run a check on Defendant's driver's license to determine the license's validity and whether Defendant had any warrants for his arrest.[7] While waiting on dispatch to respond, he asked Defendant if he had ever been arrested to which Defendant responded he was arrested about 15 or 16 years ago for a DUI.

Thereafter, McCannon motioned toward Sergeant Paquette, an Augusta native, and told Paquette the location Defendant was travelling in Augusta. Sergeant Paquette then asked Defendant some questions about his destination. While Paquette questioned Defendant, McCannon continued to complete the warning citation. McCannon then told Defendant that he would put both of his warning citations on the same form.[8]

Before completing the citations, McCannon asked Defendant the following series of questions unrelated to the traffic stop:

---

[6] *Id*. at 9:16.

[7] *Id*. at 9:33.

[8] *Id*. at 11:04.

"[Do you have] any counterfeit merchandise that you are taking to your relatives over there in Augusta? And what I mean by that is--any purses? Shoes? Shirts? Any counterfeit or bootleg CDs or DVDs or anything like that? Any illegal alcohol? Any marijuana? Any cocaine? Methamphetamine? Any heroin? Any ecstasy? Nothing like that? You don't have any dead bodies in your car?"[9]

Defendant either shook his head or responded no to each question.  McCannon had been writing the warning for 5 minutes and 22 seconds when he began asking these questions. The questioning lasted 35 seconds.

Immediately after asking those questions, McCannon asked Defendant for permission to search his vehicle, and Defendant responded yes. While Sergeant Paquette conducted a pat-down search of Defendant, McCannon continued to complete the warning citation and returned Defendant's driver's license.  Sergeant Paquette began to search the vehicle while McCannon completed the warning citations and obtained Defendant's signature.

From the time McCannon began writing the warning citations until Defendant

---

[9] *Id*. at 11:10– 11:45.

7

consented to a search, a total of 6 minutes and 10 seconds elapsed.[10] In total, it took Deputy McCannon 7 minutes and 47 seconds to complete the warning citations.[11]  At the time Defendant gave his consent to search, the duration of the stop was 9 minutes and 3 seconds.[12] The total duration of the stop for purposes of addressing the traffic violations was 10 minutes and 34 seconds.[13]

A search of the vehicle revealed a 9mm pistol, ammunition, a black stocking cap, and a camouflage ski mask.

## ANALYSIS

Defendant contends the firearm seized in this case must be suppressed because Deputy McCannon unlawfully initiated the traffic stop without probable cause or reasonable suspicion that Defendant committed a traffic offense, and then, unconstitutionally detained him longer than necessary to effectuate the purpose of the stop.[14] As explained below, the Court finds Deputy McCannon lawfully stopped

---

[10] *Id.* at 5:48 (begins writing warning); 11:58 (Defendant gives consent).
[11] *Id.* at 5:48 (begins writing warning); 13:35 (Defendant signs warning).
[12] *Id.* at 2:55 (stop begins; 11:58 (Defendant gives consent to search).
[13] *Id.* at 2:55 (stop beings); 13:34 (Defendant signs warning citation).
[14] At the end of the hearing, Defendant mentioned that the scope of the search exceeded his consent; however, Defendant made no such argument in his original brief, nor did he make this argument in his supplemental briefs; thus, it appears he has abandoned this argument. Even if he did not abandon the argument, the search here did not exceed the scope of his consent.  Deputy McCannon asked Defendant

Defendant for failure to maintain his turn signal in "good working condition" under Georgia law, and McCannon did not "measurably extend the duration" of the stop by asking a few questions unrelated to the traffic violations "so as to convert the encounter into something other than a lawful seizure."[15] Thus, the search and resulting seizure of Defendant's firearm were lawful.

Probable Cause/Reasonable Suspicion to Initiate the Traffic Stop

      The Fourth Amendment protects individuals from unreasonable search and seizure, and a traffic stop is a seizure within the Fourth Amendment.[16] A routine traffic stop is a relatively brief encounter and "is more analogous to a so-called '*Terry* stop' . . . than to a formal arrest."[17] Therefore, the legality of the stop is analyzed under the *Terry* standard.[18] Under *Terry v. Ohio*, police officers may stop and briefly detain an individual

---

whether he was carrying any counterfeit merchandise, drugs, or firearms. A "general consent to search for specific items includes the consent to search any compartment or container that might reasonably contain those items." *United States v. Zapato*, 180 F.3d 1237, 1243 (11th Cir. 1999). Even where the officer does not disclose the purpose or object of the search to the consenting party, "a police officer can reasonably interpret that consent encompasses any reasonable action necessary to carry out a search for evidence of illegal activity." *United States v. Chappell*, Case No. 1:10-CR-531-WSD-ECS-1, 2011 WL 5352947, *5 (N.D. Ga. Nov. 4, 2011) (citations omitted).

[15] *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

[16] *See United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (citations omitted).

[17] *Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (citation and quotation marks omitted).

[18] *See United States v. Lewis*, 674 F.3d 1298, 1312 n. 3 (11th Cir. 2012); *Purcell*, 236 F.3d at 1277.

if they reasonably suspect that criminal activity is occurring or about to occur.[19]

Reasonable suspicion to initiate a traffic stop must be "particularized,"[20] meaning that

"the police officer must be able to point to specific and articulable facts" justifying the

stop.[21] As a general matter, the decision to stop a vehicle is reasonable where the police

have probable cause to believe that a traffic violation has occurred.[22] Additionally,

reasonable suspicion can rest on an officer's mistake of law or fact if such mistake is

objectively reasonable.[23]

      Here, Deputy McCannon testified he initiated the traffic stop due to the vehicle's

rapidly-blinking turn signal and Defendant's failure to maintain lane. Defendant argues

neither of these reasons justified the stop. Because the Court finds the rapidly-blinking

turn signal justified the stop, it need not address Defendant's arguments regarding

failure to maintain lane.

      Under Georgia law, a vehicle must be equipped with "[a] light or lights or

mechanical signal device capable of clearly indicating any intention to turn either to the

---

[19] 392 U.S. 1 (1968).

[20] *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

[21] *Terry*, 392 U.S. at 21.

[22] *Wren v. United States*, 517 U.S. 806, 810 (1996).

[23] *Heien v. North Carolina*, ___ U.S. ___, 135 S.Ct. 530, 536 (2014) (mistake of law); *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990) (mistake of fact).

right or to the left and which shall be visible from both the front and the rear."[24] The signal lights must "be visible and understandable during daytime and nighttime from a distance of 300 feet from both the front and the rear."[25] Moreover, the statute requires that "such light or lights shall at all times be maintained in good working condition."[26]

Defendant argues a "turn signal is maintained in good condition if it works as the statute requires—clearly indicating an intention to change lanes, and visible from a distance of 300 feet from the front and back of the vehicle."[27] Thus, because Defendant's rapidly-blinking turn signal clearly indicated his intention to change lanes and was visible for a distance of 300 feet, it was maintained in good repair under Georgia law, and McCannon's belief otherwise was unreasonable.

The Court is unpersuaded by Defendant's arguments. Under Defendant's analysis, only the signal's complete failure to function is a violation of the statute. Defendant's reliance on Georgia cases finding a signal light's complete failure to function is not "in good working condition" under the statute, is not dispositive of the issue here. The holding that a signal light's complete failure to function violates the

---

[24] O.C.G.A. § 40-8-26(a)(2).
[25] *Id*. at 26(b).
[26] *Id*.
[27] Defendant's Supplemental Brief in Support of his Motion to Suppress, p. 2 [Doc. 35].

statute, is not a holding that any functioning light, including a rapidly-blinking turn signal, satisfies the statute's "good working condition" requirement.  Indeed, such an interpretation would render the "good working condition" language of the statute superfluous. The statute requires that every signal light be visible from a distance of 300 feet in the front and the rear. In a separate sentence the statute requires that "[w]hen a vehicle is equipped with . . . signal lights, such . . . lights shall at all times be maintained in good working condition."[28] Thus, the requirement that lights be "maintained in good working condition" is separate and distinct from the requirement that lights be visible from a distance of 300 feet. It is "canonical that courts must read a statute to give effect to all provisions and avoid rendering any part 'inoperative or superfluous, void or insignificant.'"[29] Thus, Deputy McCannon had probable cause to initiate the stop for a violation of O.C.G.A. § 40-8-26 due to the rapidly-blinking turn signal.

Not only did Deputy McCannon have probable cause to stop Defendant's vehicle based on the malfunctioning signal light, he also had reasonable suspicion to initiate the stop to determine whether the front signal lights were functioning properly.  At the

---

[28] O.C.G.A. § 40-8-26(b).

[29] *U.S. Commodity Futures Trading Com'n v. Hunter Wise Commodities, LLC*, 749 F.3d 967 (11th Cir. 2014) (quoting *Corley v. United States*, 556 U.S. 30, 314 (2009)).

12

hearing, Deputy McCannon testified that he had changed "a couple hundred bulbs on [his] personal vehicles, on [his] patrol cars, [and] other people's cars," so he has "a pretty good knowledge of the bulbs when they go out."[30]  Based on his experience, when a bulb is blinking very rapidly, it is not working correctly; it is indicating a problem—that either a bulb is out, or one that is about to go out.[31] Thus, he stopped Defendant because the left rapid-blinking signal light did not appear to be working correctly, and he wanted to determine if the front blinkers on the vehicle were functioning properly. Moreover, even if McCannon was mistaken that the rapidly-blinking signal light violated the "good working condition" requirement under O.C.G.A. § 40-8-26, such a mistake of law is reasonable and would "give rise to the reasonable suspicion necessary" to validate the stop and uphold the seizure.[32]  Thus, McCannon lawfully initiated the traffic stop.

Lawful Detention

Defendant also contends he was unlawfully detained because Deputy McCannon "measurably extended" the duration of the stop, asking questions unrelated to the

---

[30] Motion to Suppress Hearing Transcript, p. 13 [Doc. 32].
[31] *Id.* at pp. 13-14.
[32] *See Heien,* 135 S.Ct. at 536.

13

traffic stop rather than expeditiously processing the traffic violation.  The Government

contends Defendant's detention was not unlawfully prolonged.  It is well established

that an officer may lengthen the detention beyond that related to the initial traffic stop

where there is articulable suspicion of other criminal activity, or where the initial

detention has become a consensual encounter.[33] The Government, however, does not

argue, nor does the evidence establish, that Deputy McCannon had reasonable

suspicion of criminal activity beyond the traffic violations to detain Defendant[34] or that

the encounter had become consensual before Defendant gave consent to search his

---

[33] *See United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir. 1999).

[34] An officer must possess a "particularized and objective basis for suspecting legal wrongdoing" to lawfully detain someone based on reasonable suspicion of other illegal activity beyond the traffic violation. *United States v. Perkins*, 348 F.3d 965, 970 (11th Cir. 2003) (citation omitted). A mere "inchoate and unparticularized suspicion or hunch of criminal activity" does not rise to the "minimum level of objectivity required." *Id.* (internal quotation marks and citation omitted). Deputy McCannon testified that Defendant remained nervous throughout the encounter even when he knew he was receiving a warning, and he was travelling to an area in Augusta known for criminal activity. A driver's nervousness alone "cannot support a legitimate inference of further illegal activity that rises to the level of objective, reasonable suspicion required under the Fourth Amendment." *Id.* at 970-971.  In addition, the video does not reflect Defendant's overt nervousness. Defendant is clearly seen and heard answering questions and engaging in conversations with both Deputy McCannon and Sergeant Paquette with no signs of nervousness. Indeed, he appears composed. Regarding a driver's destination, factors that "would likely apply to a considerable number of those traveling for perfectly legitimate purposes . . . "do[] not reasonably provide . . . suspicion of criminal activity." *United States v. Boyce*, 351 F.3d 1102, 1109 (11th Cir. 2003) (internal quotation marks and citation omitted). Moreover, simply driving "on a widely used interstate that also happens to be a known a drug corridor" does not establish reasonable suspicion. *Id.* Thus, reasonable suspicion of criminal activity other than the traffic offenses does not support Defendant's detention.

vehicle.[35] The issue here centers on whether Deputy McCannon's questions unrelated to the traffic stop "measurably extended" or prolonged the duration of the stop to make it unreasonable under the Fourth Amendment. The Court finds they did not.

During the course of a lawful stop, an officer may inquire into matters unrelated to the justification for the traffic stop "so long as those inquiries do not measurably extend the duration of the stop."[36]  It is not the content of the officer's questions that converts the stop to an unconstitutional detention; it is whether the unrelated questions prolong the stop.[37] A traffic stop is "a relatively brief encounter," in which "the tolerable duration of police inquiries . . . is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend any related safety concerns."[38]

Typical ways officers address the mission involve "ordinary inquiries incident to the [traffic stop]," such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration

---

[35] Deputy McCannon retained Defendant's driver's license throughout the encounter, and therefore Defendant was not free to leave. *Compare United States v. Ramirez*, 476 F.3d 1231 (11th Cir. 2007) (traffic stop turned into consensual encounter where officer returned driver's license and registration).

[36] *Arizona v. Johnson*, 555 U.S. at  323.

[37] *See United States v. Griffin*, 696 F.3d 1354, 1362 (11th Cir. 2012).

[38] *Rodriguez v. United States*, __ U.S. __, 135 S.Ct. 1609, 1614 (2015).

15

and proof of insurance."[39]  Addressing the traffic infraction is the purpose of the stop; thus, "it may 'last no longer than is necessary to effectuate th[at] purpose.'"[40] "Authority for the seizure [ ] ends when tasks tied to the traffic infraction are – or reasonably should have been – completed."[41]

Defendant contends the Supreme Court's recent decision in *Rodriguez v. United States*[42] requires the Court to find the stop in this case unconstitutionally prolonged. Defendant argues Deputy McCannon completed the "mission" of the traffic stop after he informed Defendant that he would not receive a ticket. At that point—1 minute and 55 seconds into the stop—Defendant contends Deputy McCannon had completed his investigation into the traffic violations: he had determined Defendant was not driving under the influence and had fully checked the vehicle for the blinker malfunction. Because McCannon had no reasonable suspicion of any other criminal activity, Defendant contends all of the subsequent inquiries, including the issuance of the warning citation itself, unconstitutionally prolonged the stop and thus poisoned his consent to search the vehicle. After thoughtful deliberation, the Court disagrees.

---

[39] *Id*. at 1615 (citations omitted).

[40] *Id*. (citations omitted).

[41] *Id*.

[42] *Id*.

Although Deputy McCannon was not required to complete a warning citation, he acted fully within his discretion to do so. Certainly, completing a warning citation is a "task[ ] tied to the traffic infraction,"[43] and McCannon was authorized to detain Defendant to complete such a task. In making the valid stop, McCannon was entitled to require Defendant to exit his vehicle[44] and authorized to ask routine questions such as the destination, route, and purpose of the stop.[45]  The questions to Defendant regarding whether he was travelling with firearms, the year his car was made, and when he received his last traffic citation, were authorized as questions that either addressed the traffic violation or were related to legitimate safety concerns. McCannon also lawfully asked Defendant about his criminal history while he waited on dispatch to run Defendant's license information.[46] In addition, the Court finds no constitutional problems with Sergeant Paquette's questions to Defendant about his destination, as they were clearly asked while McCannon was writing the traffic citation.

Deputy McCannon's final questions regarding whether Defendant was carrying

---

[43] *Id.*
[44] *Pennsylvania v. Mims*, 434 U.S. 106, 111 (1977).
[45] *See United States v. Brigham*, 382 F.3d 500, 510 (5th Cir. 2009) (*en banc*).
[46] *See Purcell*, 236 F.3d at 1280 (finding that police may ask questions unrelated to the traffic violation while computer license check is in progress).

17

any counterfeit merchandise, drugs, or dead bodies are the most troubling. To determine whether the 35 seconds it took Deputy McCannon to ask these questions "measurably" extended the duration of the stop, the Court must determine whether these questions prolonged the stop "beyond the time reasonably required to complete the officer's mission."[47]  To determine "the amount of 'time reasonably required to complete [the stop's] mission,'" the Court must examine whether an officer can complete the traffic-based tasks "expeditiously."[48]

The Court finds Deputy McCannon's brief questioning occurred while he "expeditiously" completed the warning citation; therefore these unrelated inquiries did not unconstitutionally prolong the stop. McCannon had only been writing the warning citations for 5 minutes and 22 seconds when he began asking these questions. McCannon used 30 seconds of that time to put on his coat. Thus, McCannon had taken only 4 minutes and 52 seconds to ask Defendant necessary questions pertaining to the traffic citations, process the answers, and transfer the answers to the citation form. McCannon lawfully called in his license and registration to dispatch. The 35 seconds McCannon took to ask a few unrelated questions "did not transform the stop into an

---

[47] *Rodriguez*, 135 S.Ct. at 1614.
[48] *Id.* at 1616 (quoting *Caballes*, 543 U.S. at 407).

unconstitutionally prolonged seizure."[49]  Only 6 minutes and 10 seconds elapsed from the time McCannon began writing the citation until Defendant gave his consent to search his vehicle, and it took only 7 minutes and 41 seconds for McCannon to fully complete the citations.

Defendant contends the amount of time Deputy McCannon took to complete the warning citations is patently unreasonable, as he intentionally prolonged processing the citations by questioning Defendant and waiting for answers. There is no "rigid time limitation" applicable to determining whether an investigative detention is unreasonable because "[s]uch a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any situation."[50] Indeed, "[a] creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished."[51] The Eleventh Circuit has found it inappropriate "to adopt a bright-line no prolongation rule,"[52] and *Rodriguez* does not hold otherwise.  Neither *Rodriguez* nor the Constitution requires officers to become automatons. "The question is not simply

---

[49] *United States v. Griffin*, 696 F.3d 1354, 1362 (11th Cir. 2012) (citations omitted).
[50] *United States v. Sharpe*, 470 U.S. 675, 685 (1985).
[51] *Id.* at 686-87.
[52] *Griffin*, 696 F.3d at 1362.

whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it."[53] McCannon did not act unreasonably here.

The "touchstone of the Fourth Amendment is reasonableness,"[54] and the Constitution requires that the entire process remains reasonable.[55] The Court finds the entire process reasonable here. The traffic stop—from the time Defendant came to a stop until consent of the search—took 9 minutes and 3 seconds. During that time, Deputy McCannon diligently investigated the reasons for the stop and expeditiously processed the citations.  The unrelated inquiries—lasting only 35 seconds and asked while McCannon simultaneously completed the warning citation—did not "measurably extend the duration of the stop."[56] Defendant's Motion to Suppress is DENIED.

**SO ORDERED** this 20th day of August, 2015.

<u>S/  C. Ashley Royal</u>
C. ASHLEY ROYAL
United States District Judge

---

[53] *Sharpe*, 470 U.S. at 687.
[54] *Florida v. Jimeno*, 500 U.S. 248, 250 (1991).
[55] *Terry v. Ohio*, 392 U.S. 1, 19 (1968) ("The central inquiry under the Fourth Amendment . . . [is] reasonableness in all of the circumstances of the particular government invasion[.]").
[56] *Rodriguez*, 135 S.Ct. at 1615 (citing *Johnson*, 555 U.S. at 333).